16365

FRIERSON v. PORTER ACADEMY *ET AL.*
(60 S. E. (2d) 82)

*Messrs. Hagood, Rivers & Young,* of Charleston, *for Appellant,*

*Mr. James B. Heyward,* of Charleston, *for Respondents,*

June 7, 1950.

PER CURIAM.

This action was brought to determine the corporate status of Porter Academy, a military school for secondary education at Charleston, South Carolina, and to ascertain its general powers, particularly the right of the corporate authorities of said school to mortgage or sell the real estate upon which it is located in the City of Charleston, consisting of a square bounded by Ashley Avenue, Bee, President and Doughty Streets. All those having any possible interest in the controversy were made parties and duly served. The case was heard upon an agreed statement of facts which discloses the following:

In December, 1867, Dr. A. Toomer Porter established a school in connection with the work of the Church of The Holy Communion in Charleston. In 1873, the trustees of said school organized themselves into a body corporate and

politic as "The Orphan Home and School Association of The Church of The Holy Communion" by Articles of Association filed in the office of the Clerk of Court for Charleston County, for the purpose of educating such persons as should be selected by the Association and to support the individuals so selected as far as might be necessary and deemed expedient. The organization agreement provided that the funds and property of the Association could only be used for educational, charitable or religious purposes. It was stipulated that in the event of the death or resignation of any corporator, the vacancy should be filled by a majority of the remaining corporators.

By Act of the General Assembly approved January 31, 1882, 17 St. at L. 670, the corporate name was changed to "The Holy Communion Church Institute of Charleston" which, under the terms of the Act, was "invested with all the rights and privileges of bodies politic and corporate" under the laws of South Carolina, and was made successor "to all the rights of property heretofore belonging to the said 'The Orphan Home and School Association of the Church of the Holy Communion' ".

By an Act of the General Assembly approved on December 22, 1886, 19 St. at L. 482, the name of the corporation was changed to "The Porter Academy" and it was provided that its charter should continue in force for a period of 21 years.

Pursuant to a Joint Resolution of Congress approved on December 19, 1879, 21 Stat. 299, the Secretary of War leased to the trustees of said school for its use and accommodation the property upon which it is now located, then known as the "Arsenal" grounds, for a term of 99 years.

By an Act of Congress approved on March 8, 1888, 25 St. 45, the Secretary of War was authorized and directed to convey to the trustees of the Porter Academy the property heretofore described upon the condition that said property "shall be inviolably dedicated to educational purposes, and

no other." The Act further provided: "That the Secretary of War shall require the said trustees to file an acceptance in the War Department of said property, stipulating that the same shall be dedicated and used for all time for educational purposes, and for no other." Pursuant to the terms of this Act, the Secretary of War, by deed dated April 7, 1888, after reciting that the board of trustees of the Porter Academy had filed the required stipulation to the effect that the property would be dedicated and used solely for educational purposes, conveyed said property to A. Toomer Porter and others, as trustees of the Porter Academy, and their successors, "to have and to hold the said tract or parcel of land, so long as said property shall be inviolably dedicated to educational purposes, and to no other purpose, and whenever said property shall cease to be used for educational purposes, or shall be devoted to any other use or purpose, such use or failure to use as aforesaid shall operate as a defeasance of the grant herein made, and said property shall thereupon revert to the United States."

Through the able and inspiring leadership and efficient management of Dr. Porter, the school prospered and became an outstanding institution for secondary education. On a part of the property houses were constructed and the rents therefrom were used to supplement the income of the school. Dr. Porter died in 1902.

By an Act of the General Assembly approved on February 4, 1910, 26 St. at L. 1017, after reciting that the charter of The Porter Academy had expired but in the meantime it had continued to function in the same manner as if the charter were still existing and that it was the desire of the General Assembly that the charter be renewed and all acts done within the scope of the powers of the institution after its charter had expired be "made legal and binding", it was provided: "That the Porter Academy be, and is hereby, created a corporation with the rights, powers, privileges and franchise heretofore granted, and that this charter act

and have effect as if granted upon the day of the expiration of its former charter."

Since the death of Dr. Porter in 1902, the school has encountered at various times considerable difficulty in financing its operations. Temporary relief was secured through donations and loans. The buildings on the property are now very old and in bad state of repair. They need greatly to be modernized in order to make them suitable for educational purposes. It has been determined by the trustees that it is imperative that the school obtain approximately $125,000.00 for the purpose of paying current expenses, liquidating existing indebtedness, and renovating and modernizing the buildings. The trustees have found it impossible to secure a loan on the property because the power of the school to convey good title has been questioned.

Pursuant to an Act of Congress approved on August 3, 1949, 63 Stat. 492, the Secretary of the Army executed a deed on November 7, 1949, wherein, after reciting the conditions and restrictions contained in the deed of April 7, 1888, and that Congress had authorized the release of said restrictions, he "remised, released, quitclaimed, and conveyed" to the trustees of the Porter Academy, their successors in office and assigns, "all of the right, title and interest" of the United States in said property, "including all possible reversions or remainders."

The trustees desire either to borrow approximately $150,-000.00, secured by a mortgage on the property, or to sell certain apartment houses located on the property for approximately $47,000.00 and mortgage the remainder to secure a loan of $75,000.00. Their right to do so is questioned in this action, which was commenced in January, 1950, and the Court is asked to determine the following questions:

1. Is Porter Academy properly created, and does it possess any powers to hold, mortgage or sell real or personal property?

2. Does Porter Academy Corporation own the subject property?

3. Was there a formal or legal dedication of the property?

4. Are the members of the present Board of Trustees the legal owners of subject property?

5. Are the heirs of the last surviving member of the original Board of Trustees the legal owners of subject property?

6. Is the Trust created by the deed of 1888 an active or a dry trust?

7. Is there a sufficient crisis in the administration of the trust to authorize sale of a portion of the trust property for the purposes set out in the agreed statement of facts?

8. Is there a sufficient crisis in the administration of the trust to authorize mortgage of the major portion of the trust property for the purposes set out in the agreed statement of facts?

9. Can the mortgagor or mortgagors assure mortgagees that mortgagor can expeditiously sell marginal properties to prevent default and foreclosure and to obtain advantageous voluntary sales?

10. Can the by-laws and statutory powers and duties of Porter Academy Corporation define the trust set up in the two trust deeds?

The case was heard by the resident Judge of the Ninth Circuit. His decree, omitting the description of the property and certain formal parts, is as follows:

"This matter was presented to me upon an agreed statement of facts and questions of law, and various members of the Board of Trustees of Porter Academy and investment and real estate men of Charleston appeared before me in person. The testimony of these men fully supports the agreed statement of facts. It appears that the Board of Trustees of the Porter Academy have gone into the matters very thoroughly and that the program of financing as

set forth in the agreed statement is the best available and represents the considered opinion of experienced and competent investment and real estate advisers. Many of the facts set forth in the agreed statement are of a general historical or social nature, but have a peculiar application to the plight of Porter Academy. I find that the facts set forth in the agreed statement are amply proven by the testimony of the men appearing before me, and that the only difficulty confronting me is the determination of the legal issues applicable to these facts.

\* \* \*

"I find as a matter of law that the General Assembly of South Carolina enacted a special act, approved February 4, 1910, which renewed and affirmed an earlier charter granted by the General Assembly of South Carolina on January 31, 1882 to a corporation under the name of Holy Communion Church Institute of Charleston, the name of which was by Act of the General Assembly of the State of South Carolina (approved) Dec. 22, 1886, changed to "The Porter Academy", the said Porter Academy having been created under the aforesaid acts as an eleemosynary corporation as defined in Section 8161 of the Code of Laws of South Carolina for 1942, with all the powers set forth therein, including the power to sell and mortgage real or personal property. The case of *Epworth Orphanage v. Wilson,* 185 S. C. 243, 193 S. E. 644, is decisive of the question, that, unless there is some affirmative showing that the Constitution was not complied with in the enactment of a special legislative act, the charter of the corporation is good.

"I further find that from an examination of the entire instrument, namely, the deed of April 7, 1888, whereby the Secretary of War in behalf of the United States of America conveyed the premises, which are the subject of this proceeding, to A. Toomer Porter, and others, trustees of the Porter Academy, that formal dedication of the property in a legal sense was not contemplated. At the time of the said deed of 1888, the Porter Academy was incorporated

and its by-laws were well-organized to assure the eleemosy-
nary nature of the Academy and the purpose was well defined
as educational. It seems inescapable that the parties to a deed
are presumed to intend that it grant all that is necessary to
enjoy the rights conveyed, and I so find. *McManaway v.
Clapp,* 150 S. C. 249, 148 S. E. 18; *Thomas v. Greenville-
Carolina Power Company,* 105 S. C. 268, 89 S. E. 552.

"I further find that there has been an orderly and proper
succession of trustees from the time of the deed of April 7,
1888 (and even prior) to the present board, and that the
heirs of the last survivor of the original trustees have no
interest whatsoever in this action or the property or the
Porter Academy and that the by-laws of the corporation cor-
rectly set forth the method of succession of its trustees.

"The question of whether the deed from the United States
Government of April 7, 1888 taken in connection with the
deed from said Government of November 7, 1949 releasing
certain conditions originally attached, created an active trust
under which the title to the premises will continue to vest in
the trustees mentioned in said deeds or whether the trust
set forth in said deeds is a passive or dry trust whereby the
title is vested by operation of law in the Porter Academy,
a South Carolina Corporation, is presented to this Court for
consideration.

"This case would appear to be governed by the decision
of the South Carolina Supreme Court in the case of *Mc-
Manaway v. Clapp,* 150 S. C. 249, 148 S. E. 18, which case
involved a situation in which certain property was conveyed
to the State Convention of the Baptist Denomination of
South Carolina in trust to the use of Furman University
for educational purposes connected with the said Furman
University, and for no other purpose whatsoever. That trust
was held to be a dry or naked trust, and Furman University
as such was held authorized to convey a fee simple title to
said premises. In the trusts under consideration in the deeds
of trust from the United States Government above referred

to, no active duties apart from the purposes of the Porter Academy incorporated as an eleemosynary corporation for educational purposes are vested in the trustees, and furthermore, these trustees appear to be the same parties constituting the Governing Board of Porter Academy. It would therefore appear to be clear to this Court that it was the intention of the deeds from the United States Government above referred to that the property should be held and managed by Porter Academy under the powers of its charter and by-laws which would under the laws of the State of South Carolina include the right to mortgage and sell its premises when deemed best for the purpose of continuing and carrying out the purposes of its organization.

"In further support of the conclusion of this Court, that the deed into the trustees for Porter Academy constituted a dry, passive or naked trust, whereby the title became vested in the beneficiary, reference is made to the following South Carolina cases:

"In the case of *Laurens v. Jenney,* 1 Speers 356, it was held that a trust will be executed unless the object of creating it would be defeated, as in the cases of trusts for married women and to preserve contingent remainders or where the trustee has some discretion to be exercised in relation to the estate or the manner of applying the proceeds; and that it is not sufficient to prevent the estate from being executed that there be something for the trustee to do.

"Further, in the case of *Williman v. Holmes,* 4 Rich. Eq. 475, it was held that there are three circumstances necessary to the execution of a use by the statute of uses: (1) A person seized to the use of some other person; (2) A *cestui que* use *in esse;* (3) A use *in esse* in possession, remainder or reversion. And where the use is transformed from an equitable to a legal estate, the same qualities, conditions, and limitations that were applicable to it as a use follows it in its new condition as a legal estate.

*"Breeden v. Moore,* 82 S. C. 534, 64 S. E. 604, held that where testator directed the trustee to permit the testator's daughter to use and occupy lands, this does not impose any duty on the trustee so to avoid the statute of uses, and prevent the vesting of the legal title to the law estate in the daughter.

" In the leading cases of *Welborn v. Holder,* 143 S. C. 277, 141 S. E. 448, in which *Faber v. Police,* 10 S. C. 376 and other cases were favorably cited, it was held that the rule undoubtedly is, that where there is a conveyance to one for the use of another, and the trustee is charged with no duty which renders it necessary that the legal estate should remain in him to enable him properly to perform such duty, the statute of uses executes the use and carries the legal title to the *cestui que* use.

"I further find that it is absolutely necssary, in order to maintain and operate said school and to carry out its educational purposes, to renovate the buildings of the school, in order to assure a sufficient number of boarding students to enable the school to be properly operated without an annual deficit, that the reverter clause in the original deed of 1888 referred to has heretofore prevented adequate financing to make proper repairs, and to modernize the buildings to meet prsent day needs, and competition of other schools, or to secure loans with which to meet emergencies in the cost of operation needed for a modern school; that a public relations system must be set up, and that, in order to finance these needed improvements, and the work of procuring new boarding cadets, it is necessary to mortgage in the amount of $150,000.00, if possible, the entire Porter Academy property, or, if this can not be done, to sell the property known as Numbers 29-41 Bee Street, for approximately $50,000.00 and mortgage the remaining property for $75,000.00.

"I further find that Porter Academy as the owner of the premises which are the subject of this proceeding, has ample powers under the by-laws of the corporation and applicable

statutes of South Carolina to sell or mortgage such of the properties above referred to as the governing body of said corporation may determine will best serve the ultimate ends and purposes of the Porter Academy as an educational institution.

"I further find, specifically, in answer to the special questions of law propounded, as follows:

"(1) Porter Academy is a properly created eleemosynary corporation with all the powers set forth in Section 8161, 1942 Code of S. C., including powers to hold, mortgage or sell real or personal property.

"(2) The legal and equitable title to the premises which are the subject of this proceeding is vested in fee simple absolute in Porter Academy under the operation of the statute of uses.

"(3) There was no formal or legal dedication of the property by deed.

"(4) Porter Academy is the legal and equitable owner of the subject property, the powers of which corporation are defined by its by-laws and Section 8161 of the 1942 Code of Laws of South Carolina.

"(5) The heirs of the last surviving member of the original board of trustees are not the legal owners of the subject property, nor have they any interest in the property.

"(6) The trust created by the deeds of April 7, 1888 and November 7, 1949 was a passive, dry or naked trust.

"(7) The peculiar and alarming series of events besetting Porter Academy constitute a sufficient crisis to authorize Porter Academy to take such steps as are deemed necessary by its governing board, the trustees of said corporation to preserve and maintain its purpose by sale or mortgage of such portions of its property as deemed necessary.

"(8) There is also sufficient crisis to authorize the mortgaging of portions or all of the property herein referred to to carry out the reasonable program of financing set forth in the agreed statement, either the program of borrowing $75,000.00 in addition to converting the Bee Street property into cash by sale of same, or to make such other financial arrangements and take such steps by sale or mortgage as are deemed necessary by the governing board of said Porter Academy for the preserving and maintaining of the purposes for which it was created.

"(9) The Porter Academy under Section 8161 has power to sell any or all of the property, upon its determination that such sale would serve the purposes of the said Porter Academy, and it is within its power to prevent default and foreclosure by such sales as are deemed by it to be necessary.

"(10) Under the interpretation of the deeds covering the property which is the subject of this proceeding, as set forth above, answer to question 10 is unnecessary."

The decree of the Circuit Court is, for the reasons assigned therein, affirmed. All exceptions to same are overruled.