616 S.E.2d 710

EPWORTH CHILDREN'S HOME,

v.

W.F. BEASLEY, Personal Representative of the Estate of Mary Etta Johnson; Prospect United Methodist Church; and Attorney General Henry D. McMaster,

Of whom Attorney General Henry D. McMaster is Appellant,

and

Epworth Children's Home; W.F. Beasley, Personal Representative of the Estate of Mary Etta Johnson; and Prospect United Methodist Church are Respondents.

No. 26012.

Supreme Court of South Carolina.

Heard May 5, 2005.

Decided July 18, 2005.

158

Attorney General Henry D. McMaster, Deputy Attorney General T. Stephen Lynch, and Senior Assistant Attorney General C. Havird Jones, Jr., all of Columbia, for Appellant.

Gregory G. Williams, of Columbia, for Respondent Epworth Children's Home; Bryan W. Braddock, of Saleeby & Cox, PA., of Hartsville, for Respondent Prospect United Methodist Church; and J. Anthony Floyd, of Floyd & Gardner, P.C., of Hartsville, for Respondent W.F. Beasley.

Justice BURNETT:

This case raises issues regarding the authority of a personal representative and a trustee, in administering a will and testamentary trust, to modify the plan established by a testatrix-settlor under an interpretation of the document's language and the doctrines of equitable deviation and merger. We certified this case from the Court of Appeals pursuant to Rule 204(b), SCACR. We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

Mary Etta Johnson (Testatrix) died testate on December 3, 1999, and her will was duly submitted to probate court. The will provides, in pertinent part:

ITEM II: I give and devise unto the EPWORTH CHIL-DREN'S HOME [1] in Columbia, South Carolina, all of my personal effects including my jewelry, clothing, and furnishings.

ITEM III: I give and devise any remaining funds in accounts which have always been in my name alone at [two

---

1. Epworth Children's Home was established in 1895 by the Methodist Church. It is a private, non-profit child and family service organization supported by church and private contributions, will bequests, and trust funds. It provides services to children who are orphans, from broken homes, or who have disabilities or special needs without regard to race, religion, national origin, or ability to pay.

financial institutions] unto EPWORTH CHILDREN'S HOME, *IN TRUST NEVERTHELESS,* for management and distribution of the interest as follows:

1. One thousand and No/100ths ($1,000.00) Dollars per year unto my beloved sister, EDNA POSTON, for as long as she may live, which sum shall be paid directly to her or for her benefit in the discretion of my said Trustee.[2]

2. Five hundred and No/100ths ($500.00) Dollars per year unto PROSPECT METHODIST CHURCH, for so long as it shall exist.

3. The balance of the interest paid on my said accounts shall be paid annually to the EPWORTH CHILDREN'S HOME.

. . .

ITEM IX: By way of illustration and not of limitation, in addition to the inherent, implied or statutory powers granted to my Co–Personal Representatives and Trustee under law, I authorize said Co–Personal Representatives with respect to any and all property at any time constituting part of my estate or trust to hold and retain such property, to sell and dispose of same at public or private sale, at such prices and upon such terms as my Co–Personal Representatives' and Trustee shall deem proper, to invest and reinvest in any kind of property, real and personal, without limitation to the class of investments in which Co–Personal Representatives or Trustee may be authorized by statute or rule of Court; to manage, repair and improve real property belonging to my estate or trust, but said Co–Personal Representatives shall not be required to set up reserves for depreciation out of income; to lease any such real property regardless of the fact that the terms of any such lease may extend beyond the period of administration of my estate or the term of any trusts; to borrow money for the benefit of my estate or trust; to distribute any property in kind or in cash or partly in kind or partly in cash; to allocate any receipt or expense between income and principal, and to do all other acts which in Co–Personal Representatives' discretion may be necessary or appropriate for the proper and advantageous management, investment and distribution of my

---

2. Edna Poston is now deceased.

estate or trust, all of which may be done without order of or report to any Court.

Testatrix named Epworth Children's Home as Trustee of the testamentary trust. Testatrix named three relatives as co-personal representatives: her brothers, W.F. Beasley and John Beasley, and her nephew, John G. Johnson. W.F. Beasley has acted as the sole Personal Representative in this litigation.

In Items IV through VI, the will separately devised Testatrix's interest in three parcels of real property to the co-personal representatives for life, with the remainder interest devised to Trustee. The will devised two parcels of real property directly to Trustee. Trustee was directed to sell all the properties at fair market value when it received them, giving relatives of the life tenants or other family members the first option to purchase them. Upon selling the properties, Trustee was in each case directed to pay the sale proceeds "into my said testamentary trust established in Item III hereinabove." The present total value of the charitable trust assets is about $300,000.

█ In 2002, Trustee filed a petition in probate court seeking a court order declaring the charitable trust terminated *ab initio*. Prospect Methodist Church (Church) would receive a lump sum payment of $10,000, with the remainder of trust assets distributed in a lump sum to Trustee. Church filed an answer agreeing with Trustee's petition to terminate the trust. Personal Representative filed an answer asking the probate court to protect the interest of family members, but otherwise agreed with Trustee's petition to terminate the trust. The South Carolina Attorney General's Office (the State), as authorized by statute,[3] responded by opposing Trus-

---

3. South Carolina Code Ann. § 1–7–130 (2005) provides that the "Attorney General shall enforce the due application of funds given or appropriated to public charities within the State, prevent breaches of trust in the administration thereof and, when necessary, prosecute corporations which fail to make to the General Assembly any report or return required by law." Similarly, S.C.Code Ann. § 62–7–503 (1987) provides that the Attorney General shall, when necessary, bring an action to compel trustees to discharge duties imposed upon them by a charitable trust or comply with statutory provisions concerning the administration of charitable trusts. The Attorney General is the proper party to

tee's petition and asking the probate court to protect the interests of the charitable trust.

The probate court, after a hearing, terminated the testamentary trust from its inception and ordered the immediate distribution of trust assets to the beneficiaries. The probate court relied on its interpretation of Item IX of the will and the doctrines of equitable deviation and merger. The circuit court affirmed and adopted the probate court order by reference.

## ISSUES

I. Did the probate and circuit courts err in interpreting Item IX of the will to give Trustee and Personal Representative the authority to seek termination of the testamentary trust from its inception and distribute the trust assets immediately to the beneficiaries?

II. Did the probate and circuit courts err in ruling that the equitable deviation doctrine provides a basis for terminating the testamentary trust from its inception and immediately distributing the trust assets to the beneficiaries?

III. Did the probate and circuit courts err in ruling that the merger doctrine provides a basis for terminating the testamentary trust from its inception and immediately distributing the trust assets to the beneficiaries?

## STANDARD OF REVIEW

 An action to construe a will is an action at law. *See Kemp v. Rawlings,* 358 S.C. 28, 34, 594 S.E.2d 845, 848 (2004); *Epting v. Mayer,* 283 S.C. 517, 323 S.E.2d 797 (Ct.App.1984). When reviewing an action at law, on appeal of a case tried without a jury, the appellate court's jurisdiction is limited to correction of errors at law. The appellate court will not disturb the judge's findings of fact as long as they are reasonably supported by the evidence. *Townes Assocs., Ltd. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976).

protect the interests of the public at large in the matter of administering or enforcing charitable trusts. *Furman Univ. v. McLeod,* 238 S.C. 475, 482, 120 S.E.2d 865, 868 (1961).

## DISCUSSION

### I. LANGUAGE OF WILL AND TESTAMENTARY TRUST

■ The State argues the probate and circuit courts erred in interpreting Item IX of the will to give Trustee the authority to seek termination of the testamentary trust from its inception and distribute the trust assets immediately to the beneficiaries. We agree.

Item IX of the will, as set forth above, grants certain general powers to Trustee and Personal Representative. Trustee, in an argument accepted by the lower courts, focuses on a single phrase of the paragraph: "and to do all other acts which in Co–Personal Representatives' discretion may be necessary or appropriate for the proper and advantageous management, investment and *distribution of my estate or trust*" (emphasis added). Trustee argues this phrase demonstrates Testatrix placed great confidence in Trustee and authorized it to distribute all assets of the trust if it determines that is the best course of action. Further, Trustee contends the language of the will contemplates the trust may terminate at some point because it allows Trustee to enter into leases extending beyond termination.

■ The cardinal rule of will construction is to determine and give effect to the testator's intent from a reading of the will as a whole. *Matter of Clark*, 308 S.C. 328, 330, 417 S.E.2d 856, 857 (1992); *May v. Riley*, 279 S.C. 248, 250, 305 S.E.2d 77, 78 (1983); *Albergotti v. Summers*, 205 S.C. 179, 182, 31 S.E.2d 129, 130 (1944). In construing the language of a will, the appellate court must give words their ordinary, plain meaning unless it is clear the testator intended a different sense, or unless such a meaning would lead to an inconsistency with the testator's declared intention. *Buist v. Walton*, 104 S.C. 95, 88 S.E. 357 (1916); *In re Estate of Fabian*, 326 S.C. 349, 353, 483 S.E.2d 474, 476 (Ct.App.1997). A will must be read in the ordinary and grammatical sense of the words employed, unless some obvious absurdity, repugnancy, or inconsistency with the declared intention of the testator, as abstracted from the whole will, would follow from such construction. *Clark*, 308 S.C. at 330, 417 S.E.2d at 857; *Love v. Love*, 208 S.C. 363, 369, 38 S.E.2d 231, 233 (1946).

A court may not consider the will piecemeal, but must give due weight to all its language and provisions, giving effect to every part when, under a reasonable interpretation, all the provisions may be harmonized with each other and with the will as a whole. *King v. S.C. Tax Comm'n*, 253 S.C. 646, 649, 173 S.E.2d 92, 93 (1970); *Wise v. Poston*, 281 S.C. 574, 578, 316 S.E.2d 412, 414 (Ct.App.1984). The rules of construction are of secondary importance to the need to ascertain what the testator meant by the terms used in the written instrument itself, and each item of a will must be considered in relation to other portions. *Allison v. Wilson*, 306 S.C. 274, 278, 411 S.E.2d 433, 435 (1991). An interpretation that fits into the whole scheme or plan of the will is most likely to be the correct interpretation of the intent of the testator. *Lemmon v. Wilson*, 204 S.C. 50, 69, 28 S.E.2d 792, 800 (1944).

As with a will, the primary consideration in construing a trust is to discern the settlor's intent. *Bowles v. Bradley*, 319 S.C. 377, 380, 461 S.E.2d 811, 813 (1995). In fact, the law relating to discerning the drafter's intent is identical for wills and trusts. *All Saints Parish, Waccamaw v. Protestant Episcopal Church*, 358 S.C. 209, 224 n. 10, 595 S.E.2d 253, 262 n. 10 (Ct.App.2004). "Charitable trusts are entitled to peculiar favor; the courts will construe them to give them effect, if possible, and to carry out the general intention of the donor." *Colin McK. Grant Home v. Medlock*, 292 S.C. 466, 470, 349 S.E.2d 655, 657 (Ct.App.1986) (citing *Porcher v. Cappelmann*, 187 S.C. 491, 499, 198 S.E. 8, 11 (1938)).

While precedent is helpful at times, "no will has a brother." A court may find little guidance in prior decisions interpreting wills and testamentary trusts in other cases due to the different intent and circumstances of each testator or settlor. *E.g. Estate of Houston*, 491 Pa. 339, 421 A.2d 166, 170 n. 5 (1980) ("No will has a brother, declared Sir William Jones.... Each will is its own best interpreter, and a construction of one is no certain guide to the meaning of another."); *Ball v. Phelan*, 94 Miss. 293, 49 So. 956, 963 (1909) ("If any one thing can be evident, after the review of the authorities, it is what Sir William Jones said more than 200 years ago, that 'no will has a brother.' Every will must be determined upon considerations pertaining to its own peculiar facts and terms alone.")

In the present case, Testatrix and the will drafter could have given greater scrutiny to the potential impact of the phrase—"distribution of my estate or trust"—contained in the recitation of general powers set forth in Item IX. Testatrix could have stated explicitly whether the "distribution" at issue was distribution of all trust assets or simply distribution of the annual interest income as provided in Item III. She did not.

Nevertheless, we conclude the lower courts' interpretation of the language is not reasonably supported by a plain reading of the will and testamentary trust. The lower courts erred in discerning Testatrix's intent by isolating this single phrase and interpreting it in a manner which conflicts with the remainder of the will. A reading of the will and testamentary trust as a whole, giving due weight to all their provisions in an effort to read them in harmony, reveals Testatrix did not intend by this phrase to give Trustee the power to terminate the trust and immediately distribute all trust assets.

The grant of various general powers in Item IX, including the cited phrase, was intended to give substantial latitude to Trustee and Personal Representative in the management and administration of Testatrix's trust and estate. However, the "distribution" contemplated by Testatrix as shown by the terms of her will was not the immediate distribution of all trust assets, but distribution of the annual sum of interest on the invested funds. Testatrix intended to ensure Trustee had ample freedom to spend the annual sum as it wished without extensive oversight or interference. We conclude this single phrase, although inartfully drafted, can not be read in isolation in a manner which conflicts with the obvious, stated intent of Testatrix as shown throughout the remainder of her will.

This interpretation accurately reflects Testatrix's intent because, first, Item III plainly and explicitly states the assets are to be held in trust, with specific amounts paid annually to Testatrix's sister "for as long as she may live" and to Church "for so long as it shall exist." Remaining accrued interest must be paid annually to Trustee, an event which Testatrix expected to occur for the foreseeable future because that provision contained no limiting language. Second, each provision relating to five parcels of real property requires "proceeds of the sale of this property shall be paid into my said

testamentary trust established in ITEM III hereinabove." This requirement again reflects Testatrix's desire to establish a trust in perpetuity for the benefit of Trustee and Church. Third, it is evident from the face of the document that Testatrix understood the difference between an outright devise and one placed in trust because she devised her personal property outright to Trustee in Item II while placing other assets in trust in Item III.

Trustee further argues that obtaining the money in a lump sum would allow Trustee to more effectively accomplish its mission than receiving interest income in smaller, incremental amounts. Therefore, because Testatrix admired Trustees mission and efforts, she would approve of an immediate disbursal of the trust assets. Trustee also asserts administrative costs will consume a substantial portion of the annual income and Trustee in truth does not wish to serve as Trustee. We note Trustee did not present any testimony or evidence in the probate court supporting its conclusory assertions.

These arguments are decidedly unpersuasive. Trustee's wish that Testatrix would have disposed of her estate differently and its beliefs about the best way for Testatrix to make a charitable gift, as well as Trustee's understandable desire to receive the corpus now, are irrelevant and of no legal import in these circumstances. Trustee is a well established and respected institution which undoubtedly could use the trust assets for current needs.

However, Testatrix has established an enforceable testamentary trust, and the courts are required to enforce it. Administrative costs should not be prohibitive, assuming Trustee has invested the funds conservatively. *See* S.C.Code Ann. § 62–7–302 (Supp.2004) (Uniform Prudent Investor Act).

## II. EQUITABLE DEVIATION DOCTRINE

The State argues the probate and circuit courts erred in ruling the equitable deviation doctrine provides a basis for terminating the testamentary trust from its inception and immediately distributing the trust assets to the beneficiaries. The doctrine does not apply. Trustee has not shown any changed circumstances or conditions which have occurred since Testatrix established the charitable trust. We agree.

 This Court has rejected the doctrine of *cy pres,* which allows a court in limited circumstances to apply the funds of a charitable trust to a purpose not designated by the terms of the trust, but related to the original purpose. *S.C. Natl. Bank v. Bonds,* 260 S.C. 327, 337, 195 S.E.2d 835, 840 (1973); *Mars v. Gibert,* 93 S.C. 455, 465, 77 S.E. 131, 134 (1913); *All Saints Parish, Waccamaw v. Protestant Episcopal Church,* 358 S.C. 209, 227, 595 S.E.2d 253, 263 (Ct.App.2004); *Colin McK. Grant Home v. Medlock,* 292 S.C. 466, 470, 349 S.E.2d 655, 657 (Ct.App.1986). However, our appellate courts have approved of and applied the doctrine of equitable deviation, which "permits deviation from a term of the trust if, owing to circumstances not known to the settlor and not anticipated by him, compliance would defeat or substantially impair the accomplishment of the purposes of the trust. Under these circumstances a court may direct or permit a trustee to accomplish acts that are unauthorized or even forbidden by the terms of the trust." *Colin McK. Grant Home,* 292 S.C. at 473, 349 S.E.2d at 659 (allowing trustees to deviate from original terms of charitable trust by selling six homes built in Charleston to serve needy, elderly, white Presbyterians and investing proceeds of sale with income distributed as housing subsidy to elderly, needy Presbyterians of all races).

When circumstances change, it is not always required "that the details of the plan laid down in the will must be followed to the letter. The main purpose [of the will and testamentary trust] being kept in view, considerable flexibility will always be allowed in the details of the execution of a trust, so as to adapt it to the changed conditions." *Mars,* 93 S.C. at 466, 77 S.E. at 135 (refusing to allow trustees of John de la Howe School to deviate from original terms of charitable trust contained in 1797 will by devoting funds to college scholarships instead of early education, but explaining trustees could establish a school at a different location, which could work in conjunction with public school system to teach agricultural and mechanical arts); *see also S.C. Natl. Bank,* 260 S.C. 327, 195 S.E.2d 835 (allowing trustees to deviate from original terms of charitable trust contained in a 1947 will to provide college funds to "deserving students of Greenville City High Schools" to include such students attending all high schools within a reorganized, consolidated, and much-changed school district encom-

passing most of Greenville County in 1970s when the trust provision took effect); *Furman Univ. v. McLeod,* 238 S.C. 475, 120 S.E.2d 865 (1961) (allowing university trustees, in light of changed conditions related to growth of city, advent of automobile, and changes in neighborhood, to deviate from trust established by nineteenth century deeds by selling original college sites and relocating university to area outside city).

Trustee, repeating some of same arguments discussed in Issue I, contends its situation is analogous to those present in *S.C. Natl. Bank; Furman Univ.,* and *Colin McK. Grant Home.* Trustee argues Testatrix intended to assist Trustee and Church in their respective missions, but the "real value in [Testatrix's] gift is not its ability to produce income, but its ability to provide current assistance to the beneficiaries in carrying out their missions.... Even if [Testatrix's] Will does not provide the power to distribute the trust assets, the court should alter the terms of the trust to allow the distribution."

The lower courts' finding is not reasonably supported by a plain reading of the testamentary trust. The equitable deviation doctrine simply is not implicated in the present case. Trustee has not identified any changed conditions or circumstances which would justify deviation from the terms of Testatrix's charitable trust. Trustee and Church still exist and are engaged in the same mission and efforts they were pursuing when Testatrix wrote her will. As explained in Issue I, Testatrix intended to establish a fund which would generate income annually for the beneficiaries, and that is exactly what must occur.

## III. MERGER DOCTRINE

The State contends the probate and circuit courts erred in ruling that the merger doctrine provides a basis for terminating the testamentary trust from its inception and immediately distributing the trust assets to the beneficiaries. We agree.

A testamentary trust arises when a testator, in his will, declares the creation of a trust, identifies the property to which the trust pertains, and names a trustee and a beneficiary. *Johnson v. Thornton,* 264 S.C. 252, 257, 214 S.E.2d 124, 127 (1975). In a trust, the trustee holds the legal estate or

title for the benefit of the beneficiary. The beneficiary holds the equitable estate or title and enjoys the benefits of the estate. *Id.* at 257, 214 S.E.2d at 127; *Morgan v. Merchants & Planters Natl. Bank,* 247 S.C. 435, 441, 147 S.E.2d 702, 705 (1966); *Albergotti v. Summers,* 203 S.C. 137, 143–44, 26 S.E.2d 395, 398 (1943); *Board of Directors of Theological Seminary v. Lowrance,* 126 S.C. 89, 104, 119 S.E. 383, 388 (1923).

 This Court has explained the merger doctrine in the trust context as follows:

An essential to the existence of any trust is the separation of the legal estate from the beneficial enjoyment; and no trust can exist where the same person possesses both. If the legal and equitable estates come together in the same person the equitable is merged in the legal, and the trust is terminated.... A man cannot hold in trust for himself, but the whole interest vests in him absolutely, and any limitations over are void.

*Board of Directors,* 126 S.C. at 104–06, 119 S.E. at 388; *see also* Bogert, *Trusts & Trustees,* § 129 (2d ed. 1984); 28 Am.Jur.2d *Estates* § 429 (2000); 31 C.J.S. *Estates* §§ 129–131 (1996) (all stating same principles).

 "The equitable doctrine of merger is not one to be applied with rigidity. Equity will not apply merger if serious injustice would result or if the settlor's intent obviously would be frustrated." Bogert, *supra,* at § 129. "The merger of an equitable title into the legal title will not be permitted when the result would defeat the intention of the grantor or testator or the holder of the estates. Thus, equity will not recognize a merger or union of the legal and equitable estates in the same person if this is contrary to the intention of the parties and a merger would be to destroy a valid trust, and will prevent the merger of an equitable and a legal estate to work substantial justice." 28 Am.Jur.2d *Estates* § 429.

Trustee contends that, because Church has expressed its desire to disclaim its interest under the testamentary trust, Trustee would become the sole beneficiary of the trust. Both legal and equitable title would merge and vest solely in Trustee, which would then hold legal title to the trust assets.

The State argues that Testatrix intended to provide an ongoing annual benefit for Trustee and Church. Furthermore, even if Church no longer existed, Trustee would still be required to comply with the terms of the trust and distribute the annual income for the benefit of the children cared for by Trustee.

We conclude, based on our enforcement of the terms of the trust as explained in Issue I, there is no merger of legal and equitable interests. Trustee, as holder of legal title to the assets, has the duty of complying with the terms of the trust—managing the assets and distributing the annual income to the beneficiaries (itself and Church). The merger doctrine will not be applied so as to defeat or frustrate the intent of Testatrix as revealed by an interpretation of the provisions of her will and testamentary trust as a whole.

## CONCLUSION

For the foregoing reasons, we reverse the probate and circuit courts and uphold the terms of the charitable trust established by Testatrix in her will. Trustee has the duty of managing the trust assets and distributing the annual interest income to itself and Church as provided in the testamentary trust.

**REVERSED.**

TOAL, C.J., MOORE, WALLER and PLEICONES, JJ., concur.